UNITED STATES BANKRUPTCY COURT
FOR THE
DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~~~~

In re
**BRIAN SULLIVAN,**  Chapter 7
    Debtor  Case No. 08-18652-JNF

~~~~~~~~~~~~~~~~~~~~~~~~~~~

**STEPHANIE R. LUSSIER,**
    Plaintiff
v.  Adv. P. No. 09-1211
**BRIAN SULLIVAN,**
    Defendant

~~~~~~~~~~~~~~~~~~~~~~~~~~~

MEMORANDUM

I. INTRODUCTION

The matter before the Court is the complaint, captioned "Complaint 2: Plaintiff's Amended Objection to Discharge pursuant to § 727(a)(4)(a) [sic] Debtor Knowingly and Fraudulently Made False Oath and Account," filed by Stephanie R. Lussier (the "Plaintiff")

1

against Brian Sullivan (the "Debtor").[1] Through her Complaint, the Plaintiff, who formerly had a domestic relationship with the Debtor and with whom she shares a child, seeks to deny him a discharge under 11 U.S.C. § 727(a)(4)(A).

The Court conducted a trial on November 30, 2010 at which the Debtor testified and twenty exhibits were introduced into evidence. The Plaintiff represented herself, while the Debtor, who set forth his occupation as "real estate attorney" on Schedule I-Current Income of Individual Debtor(s), was represented by counsel. The issue presented is whether the Plaintiff sustained her burden of establishing that the Debtor knowingly and fraudulently made a false oath by omitting and undervaluing assets on Schedule B-Personal Property.

This Court has jurisdiction pursuant to 28 U.S.C. §§ 157(b)(2)(J) and 1334(b). The Court now makes its findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

**II. FACTS**

The Debtor filed a voluntary Chapter 7 petition on November 13, 2008, together with his Schedules of Assets and Liabilities, Statement of Financial Affairs and other required documents. He signed the "Declaration Concerning Debtor's Schedules," attesting to their truth and correctness, under penalty of perjury on October 31, 2008. The day after the Debtor filed his petition, the United States Trustee appointed Joseph Braunstein the Chapter 7 trustee (the "Trustee").

---

[1] The Plaintiff also filed "Complaint 1: Plaintiff's Amended Complaint to Determine Non Dischargeability of Debt Pursuant to § 523(a)(4), (a)(6) and Relief from Automatic Stay."

On Schedule B-Personal Property, the Debtor listed the following assets: 1) a Citizens bank checking Acct#****2254 with a current value of $300.00;[2] 2) household furniture with a current value of $500.00; 3) wearing apparel worth $500.00; 4) term life insurance with no cash value; 5) a 401 K retirement account offered by his employer with a value of $19,100.00; and 6) a Chevrolet Chevelle worth $9,500.00.  To all of the other twenty-nine types of personal property set forth on Schedule B, including "furs and jewelry," the Debtor checked the column captioned "NONE."

On Schedule C-Property Claimed as Exempt, the Debtor claimed the Citizen's Bank Account in sum of $300.00 as exempt under 11 U.S.C. § 522(d)(5) and the Chevrolet Chevelle in the sum of $9,500.00 as exempt under 11 U.S.C. § 522(d)(2) and (d)(5).

On Schedule D-Creditors Holding Secured Claims, the Debtor listed, among other secured creditors, Ash's Auto Body as the holder of a mechanic's lien in the amount of $16,721.00, noting that the unsecured portion was $9,500.00.

On Schedule E - Creditors Holding Unsecured Priority Claims, the Debtor listed the Plaintiff as the holder of a claim in the sum of $2,015.80, as well as the Internal Revenue Service and the Massachusetts Department of Revenue with claims totaling approximately $95,000.  On Schedule F-Creditors Holding Unsecured Nonpriority Claims, the Debtor again listed the Plaintiff as the holder of a claim in the amount of $100,000, while noting that it was "undetermined and subject matter of pending litigation," although he did not check the boxes indicating that the claim was contingent, unliquidated or disputed.  The

---

[2] On Schedule B, the Debtor checked "None" for "Cash on Hand."

3

Debtor also listed his parents, Janet and Robert Sullivan of Hingham, Massachusetts, as holders of a claim in the amount of $74,000.00 with respect to a "personal loan." He listed total unsecured claims of $295,476.13, including the claims held by the Plaintiff and his parents.

In his Statement of Financial Affairs, the Debtor disclosed income of $191,000 in 2006; $161,000 in 2007 and $29,000 in 2008. He also disclosed a pending lawsuit brought by the Plaintiff in the Norfolk Superior Court, Department of the Trial Court, for breach of contract, as well as lawsuits pursuant to which his boat and BMW motor vehicle were repossessed.

Contrary to his representations on Schedule B, the Debtor owned a Rolex watch. At a continued section 341 meeting, the Plaintiff informed the Trustee that upon review of the Debtor's Schedule of Assets, she noticed that the Debtor had failed to list a Rolex watch worth $6,200 which she had given him. A colloquy ensued, and the Debtor admitted that he had a Rolex watch although he had sold the watch the Plaintiff had given him and acquired another one.

In a Supplemental Response to Plaintiff's First Set of Interrogatories, the Debtor again admitted that he had a Rolex watch at the commencement of his case. He stated:

> I brought [it] to my 341 Meeting and showed [it] to the Chapter Trustee[.] I surrendered it to my counsel pending instructions to turn it over. The watch is now worthless. I do not believe my attorney has received instructions regarding the turnover of the watch given its value.

The Debtor's response to the interrogatory was misleading in that he did not voluntarily

4

reveal that he owned a Rolex watch and only showed it to the Trustee after the Plaintiff advised the Trustee that she had given the Debtor a Rolex watch as a gift.

The Plaintiff submitted a receipt from Hingham Jewelers, an "Official Rolex Jeweler." The receipt, which was dated August 22, 2006, approximately two years before the commencement of the case, showed the purchase of a "Gents Rolex Submariner, Stainless Steel with Black Dial/Insert, OysterLock Bracelet" for $3,800, and a "Ladies Rolex Oyster Perpetual S/Steel with Polished Bezel, Black Dial, Oyster Bra[celet]" for $3,050 for a total of $6,850, less $340 in discounts and $5,000 attributable to the trade-in of a "Gents Rolex DateJust [sic] 18K & S/Steel."

At the trial, the Debtor testified that the serial number and the Rolex crown hologram on the back of his watch had worn away, and, thus, in his mind, the watch could not be authenticated as a genuine Rolex watch and could not be sold as such. Nevertheless, on August 10, 2010, the Debtor filed a Motion to Amend Schedules B and C. In his Motion, he again represented that the watch could not be authenticated, but indicated that, "based on eBay comparables which appear to be in better condition the watch could be worth as much as $1,760.00." The Debtor amended Schedule B to list the a "'Submariner' Rolex watch (used)," and he claimed it as exempt on Schedule C-Property Claimed as Exempt.

In 2005, the Debtor, who had previously acquired several classic automobiles, purchased a Chevrolet Chevelle on eBay for $33,433. He testified that the car looked good, that he liked the picture of the car and "probably overbid for it." Soon after the Debtor purchased the Chevelle, he requested "Stated Amount Coverage" to be added in the

5

amount of $39,000 based upon an appraisal. The "Request for Stated Amount Physical Damage Coverage" required the submission of an appraisal by a licensed appraiser. That appraisal was prepared by Lennard S. Kosonen ("Kosonen") of Mass. Appraisal Service. Kosonen prepared a thorough, three-page appraisal dated August 6, 2005. He examined the interior and exterior of the automobile, the bumpers, the glass, the wheels and wheel covers, as well as the lights, directional signals, windshield wipers, horn, suspension, steering, and brakes, including the drums and rotors. He determined that the frame was structurally sound, that there was no rot. The only defect he observed was a crack in the crash pad. He determined the value of the car to be $39,000, stating that the Chevelle was "a fine restoration with only minor flaws observed in body work," adding "all other restoration efforts appear first rate."

The Debtor testified that after purchasing the vehicle and driving it for awhile he took it to Auto Truck & Trailer of Quincy for some mechanical work because none of the gauges worked, and the steering mechanism and suspension system had problems. While the car was in Quincy, it was vandalized. The Debtor, however, submitted no evidence that he made an insurance claim for the damages resulting from the vandalism.

The Debtor subsequently brought the Chevelle to Ash's Auto Body where he learned from his neighbor, James Ash ("Ash"), the owner of Ash's Auto Body, that his initial positive assessment of the Chevelle was flawed and that paint covered rot and structural damage. The Debtor testified that Ash informed him of the car's deficiencies. According to the Debtor, Ash "unearthed a ton of structural defects," adding: "[t]he whole

6

pillar and column had been crushed and puttied back together." Based upon what he learned from Ash, the Debtor indicated that the automobile he bought at auction may have been "a Skylark clip on a Chevelle frame and body."

In a undated letter to the Trustee, Ash, who did not testify at the trial, set forth the grounds for the Debtor's testimony. He wrote:

> I am in possession of Brian Sullivan's 1970 Chevrolet Chevelle. To date Mr. Sullivan has run up an outstanding bill of $16,721.81 plus storage fees. The car in question is a non numbers [sic] matching 1970 Chevelle. I have also discovered that the body "clip" of the car is most likely from a period correct Buick Skylark on the subframe of a Chevrolet Chevelle. (GM used the same body platform for all of their A body cars)[.]
>
> Decoding the VIN indicates that this car is not a real SS, as well, the incorrect suspension and cowl tag also indicate that it is not an actual SS model. The car was brought to me with some minor vandalism to the grill, doors and door lock cylinders. Subsequent inspection unearthed a ton of structural and cosmetic problems. In my opinion, the car was involved in a serious wreck (either a roll-over or perhaps a tree fell) crushing the roof. Prior to Mr. Sullivan's purchase, the car was "puttied" back together in a deceptive manner. It was then painted.
>
> The car's value is essentially whatever someone would pay for it, but it is **NOT** a high value car. It is non-numbers matching patchwork vehicle. It is not the highly desirable SS, and certainly not the expensive LS-6 model. I hope that I can get what I have into the car, but doubt it. If I could get somewhere close to that the car, I would consider it a victory.

The Defendant submitted no evidence that Ash is or was a licensed appraiser.

Although the Debtor disclosed a mechanic's lien held by Ash's Auto Body at the time of the commencement of his case, the Debtor's parents, Janet and Robert Sullivan paid substantial sums to repair the vehicle and satisfied the mechanic's lien. The Plaintiff introduced into evidence checks and credit card receipts, totaling over $17,000, and the

7

Debtor admitted on the witness stand that his parents paid Ash Auto Body approximately $23,000 to repair the vehicle. In answers to interrogatories, he stated "[m]y parents have paid Ash's Auto Body more than $25,000 starting in July 2007," adding [t]hey have also paid for other restoration services and parts totaling more than $3,792.75 since the summer of 2007." In answers to interrogatories, he indicated that he transferred an interest in the Chevelle to his father because his parents paid for the repairs to the vehicle.

The Trustee's appraiser, R. Walter Nordberg ("Nordberg"), of Paul Saperstein and Company, Auctioneers and Appraisers, indicated that, excluding costs of sale, "if the vehicle was sold at a 'forced liquidation' (auction) [it] would generate in the range of $15,000 - $20,000 if it was a 'reasonable and commercial' sale." Nordberg did not personally inspect the vehicle and based his valuation on pictures shown to him by the Debtor. Based upon Nordberg's assessment of the Chevelle's value, and his determination that the Debtor was entitled to exempt $11,100 with respect to the vehicle, the Trustee stated in a letter to the Plaintiff that he did not believe there would be "anything meaningful that could be available for the Estate."[3]

---

[3] The Court notes that it could be argued that the Debtor's exemption amount should be limited to the amount claimed of $9,500. See Schwab v. Reilly, __ U.S. __, 130 S.Ct. 2652, 2657 (2010), in which the Court stated:

> The issue is whether an interested party must object to a claimed exemption where, as here, the Code defines the property the debtor is authorized to exempt as an interest, the value of which may not exceed a certain dollar amount, in a particular type of asset, and the debtor's schedule of exempt property accurately describes the asset and declares the "value of [the] claimed exemption" in that asset to be an amount within the limits that the Code prescribes. . . . We hold that, in cases such

The Plaintiff introduced into evidence an appraisal of the Chevelle prepared by Paul Viles ("Viles"), dated May 31, 2010. Viles, a licensed appraiser, identified the car as a 1970 Chevrolet Chevelle, SS 454 2 Door Hardtop and made no mention of a "Skylark clip." He examined the exterior and interior of the vehicle, as well as the engine, engine compartment, driveline and suspension, undercarriage, trunk and cargo area, wheels and tires, options and accessories. Valuing the vehicle at $27,300, he stated:

> Last of a breed, this 1970 Chevelle SS epitomizes an era when horsepower ruled the roads and the price of gasoline was a mere afterthought. Combined with the legendary RPO LS5 454 cubic inch engine (not factory original) delivering 360+ horsepower and a Hurst 4-speed shifter, this vehicle represents a time in automotive history that will never be duplicated.
>
> The Chevelle SS 454 ranks, in my opinion, among the top 5 muscle cars ever produced. Excluding the mid sixties 427 Corvettes, only the Chrysler Hemi's or a Ford Mustang Mach I could give the Chevelle a run for the money. Conservatively rated at 360 horsepower, these factory built machines were delivered with lightning speed and impressive torque and power.
>
> Because the Chevrolet vehicle identification numbers (VIN) of 1970 do not specifically designate a Chevelle SS from a standard Chevelle, I do believe this to be a factory Super Sport model. As a factory original or nicely restored "clone", this Chevelle SS possesses all the correct markings of a true SS. With its relatively low mileage and outstanding performance, *I believe this car will be an investment that will only gain in value.*

(emphasis supplied).

The Debtor testified that when he prepared his Schedules of Assets "[f]or the car,

---

as this, an interested party need not object to an exemption claimed in this manner in order to preserve the estate's ability to recover value in the asset beyond the dollar value the debtor expressly declared exempt.

I went to the NADA website . . . entered in the accurate description of the car, and it came up with that $9,500."

On Schedule B, as noted above, the Debtor listed $300 in his checking account at Citizens Bank. In actuality, bank records of his account at Citizens Bank submitted by the Plaintiff establish that the Debtor had $1,840.09 in the account on the petition date and that he had made a $2,264.11 deposit on October 27, 2008 and a $3,095.00 deposit on November 10, 2008. Additionally, he withdrew $606.00 in three separate transactions on November 10, 2008 and withdrew $201.95 on November 13, 2008. The Debtor testified that he examined his check register, ATM and bank slips before setting forth the amount of money in his bank account on Schedule B. He also testified that he did not keep track of his checks very well and had to make many payments in cash. He admitted that he really didn't know how much money was in the account. In answers to interrogatories, he stated that "what was represented in my bankruptcy Schedule B was accurate as it relates to the cash I had in my pocket at the time of the filing."

### III. DISCUSSION

A. Applicable Law

In Commonwealth of Massachusetts v. Sohmer (In re Sohmer), 434 B.R. 234 (Bankr. D. Mass. 2010), this Court, quoting Boroff v. Tully (In re Tully), 818 F.2d 106, 110 (1st Cir. 1994), summarized the law applicable to complaints under 11 U.S.C. § 727(a)(4). It stated:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, In re Shebel, 54 B.R. 199, 202

> (Bankr. D. Vt.1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." Matter of Mascolo, 505 F.2d 274, 276 (1st Cir.1974).
>
> The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor. Matter of Vickers, 577 F.2d 683, 687 (10th Cir.1978); In re Leichter, 197 F.2d 955, 959 (3d Cir.1952), *cert. denied*, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); Roberts v. W.P. Ford & Son, Inc., 169 F.2d 151, 152 (4th Cir.1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir.1934).
>
> On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Mascolo, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. *See* In re Tabibian, 289 F.2d 793, 797 (2d Cir.1961); In re Shebel, 54 B.R. at 202. The bankruptcy judge must be deft and evenhanded in calibrating these scales.

In re Sohmer, 434 B.R. at 249 (quoting In re Tully, 818 F.2d at 110).

In Gordon v. Mukerjee (In re Mukerjee), 98 B.R. 627 (Bankr. D. N.H. 1989), the court discussed the requirement that a statement be false and knowingly and fraudulently made. It stated that the requirement is satisfied " if the debtor "knows the truth and nonetheless wilfully and intentionally swears to what is false." Id. at 629 (quoting In re Ingle, 70 B.R.

11

979, 984 (Bankr.E.D.N.C.1987), and In re Cline, 48 B.R. 581, 584 (Bankr. E.D. Tenn. 1985)). The First Circuit in Tully has noted that "'reckless indifference to the truth' . . . has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." In re Tully, 818 F.2d at 112.

The requirement of materiality is satisfied "if the false oath bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property." Gordon v. Mukerjee (In re Mukerjee), 98 B.R. at 629 (citing In re Johnson, 82 B.R. 801, 805 (Bankr. E.D.N.C. 1988), and In re Williamson v. Fireman's Fund Ins. Co., 828 F.2d 249, 251-52 (4th Cir.1987)), although "[a] trivial matter which has but little effect upon the estate and the creditors is treated as immaterial." Mukerjee, 98 B.R. at 629 (citing Field v. Irving (In re Irving), 27 B.R. 943, 945 (Bankr. E.D.N.C. 1983)). In In re Sohmer, this Court noted that "the materiality of an omission is not solely based on the value of the item omitted or whether it was detrimental to creditors. Rather, the statement need only "bear [ ] a relationship to the bankrupt's business transactions or estate, or concern[ ] the discovery of assets, business dealings, or the existence and disposition of his property." Beaubouef v. Beaubouef (In re Beaubouef), 966 F.2d 174, 178 (5th Cir.1992) (quoting Chalik v. Moorefield (In re Chalik), 748 F.2d 616, 617 (11th Cir.1984)). Finally, as the court in In re Koss), 403 B.R. 191 (Bankr. D. Mass. 2009), observed:

> The Debtor's schedules, including Schedule B, are "unsworn declarations made under penalty of perjury and are, according to federal law, the equivalent of a verification under oath." Poliquin v. Cox (In re Cox), No.

> 05-15357, 2009 WL 57523, at *2 (Bankr. D. N.H. Jan. 6, 2009)( quoting In re Grondin, 232 B.R. 274, 276 (1st Cir. BAP 1999)). The "requirement of an honest, conscious effort to prepare accurate, detailed and complete Schedules . . . is not intended as a trap for the unwary or undue emphasis on technical compliance but, rather, as a reasonable quid pro quo." Guardian Industr. Prod, Inc. of Mass. v. Diodati (In re Diodati), 9 B.R. 804, 809 (Bankr. D. Mass. 1981). Again, in the words of Tully, "[s]worn statements filed in any court must be regarded as serious business. In bankruptcy administration, the system will collapse if debtors are not forthcoming." 818 F.2d at 112.

Koss, 403 B.R. at 212.

B. Analysis

The Court finds that the Debtor intentionally and with fraudulent intent omitted and undervalued assets on Schedule B. The Rolex watch was the most serious omission. The Debtor proffered no legitimate excuse for his failure to list the watch on Schedule B. Although he contended that the watch had no value, the receipt from Hingham Jewelers proves otherwise. Although the watch may not have been worth as much as what the Debtor paid for it, it was not worthless. As the United States Bankruptcy Appellate Panel for the Tenth Circuit recognized in United States Trustee v. Garland (In re Garland), 417 B.R. 805 (B.A.P. 10th Cir. 2009),

> [M]ateriality is not defeated by the fact that the undisclosed property interests are determined to be without value. This is because "[b]ankruptcy is a serious matter and when one chooses to avail himself of the benefits of Chapter 7 relief he assumes certain responsibilities, the foremost being to fully disclose his assets and to cooperate fully with the trustee." As such, debtors have an "uncompromising duty to disclose whatever ownership interest [they hold] in property," and they must "disclose everything," rather than "make decisions about what they deem important enough for parties in interest to know."

417 B.R. at 814-15. *See also* In re Sohmer, 434 B.R. at 253.

13

The Debtor was obligated to disclose ownership of the Rolex watch on Schedule B, but he did not, unilaterally making the determination that it had no value. This was not his decision to make. The Debtor's testimony that he proffered the watch to the Trustee at the section 341 meeting does not excuse his false answer, "None," to the question of whether he owned "Furs and jewelry." The Debtor's decision to amend Schedule B in August of 2010, shortly before the commencement of the trial, is indicative of the Debtor's belated concession that the Rolex watch should have been disclosed as an asset at the commencement of the case.

Similarly, the Court finds that the Debtor undervalued the amount of money in his Citizens Bank account. Although the daily balances in his Citizens Bank account fluctuated, the deposit of $3,095 on November 10, 2008, coupled with the Debtor's use of a MasterCard for the bulk of his purchases, should have suggested to him that his bank account balance was more than $300. Indeed, the balance in the account on the petition date was $1,840.09. Moreover, his attempt to equate "cash on hand" with the amount in his bank account at Citizens Bank is unavailing. As the United States Court of Appeals for the First Circuit observed in Tully, "'reckless indifference to the truth' . . . has consistently been treated as the functional equivalent of fraud for purposes of § 727(a)(4)(A)." In re Tully, 818 F.2d at 112.

A determination of whether the Debtor intentionally undervalued the Chevelle with the intent to defraud creditors poses a more difficult issue because of the varying opinions of its value over a five-year period. The Debtor's statement that he may have over paid for

14

the vehicle and that it was worth only $9,500, however, is inconsistent with the appraisal prepared by Kosonen, the insurance appraiser, after he purchased it and elected to obtain Stated Amount Physical Damage Coverage. Moreover, the Debtor did not submit any evidence that he contacted the seller of the Chevelle to obtain redress or lodged a fraud complaint with eBay. If the seller had advertised the car as a Chevelle SS and it was, in Ash's words, a Skylark "clip" on a Chevelle subframe, the Debtor potentially had an action against the seller for fraud. The Debtor did not testify about what, if any, actions he took against the seller. Notably, neither Kosonen nor Viles observed that the vehicle had a Skylark "clip." Finally, if the vehicle was worth only $9,500 when the Debtor filed his bankruptcy petition, it is inconceivable that his parents would have invested over $25,000 in the car after the commencement of his Chapter 7 case.

In view of the evidence that Ash was a neighbor of the Debtor, did not testify at trial, and is not a licensed appraiser, the Court discredits his assessment of the vehicle's value. At any rate, he opined that it would be a "victory" to have obtained approximately $16,000 for the vehicle, an amount significantly more than what the Debtor set forth on Schedule B. The Court concludes that the Chevelle was worth considerably more than the $9,500 ascribed to it by the Debtor at the commencement of the case, and had the potential to increase in value. The Court concludes that the Debtor intentionally undervalued the vehicle in order to retain it and benefit from its potential appreciation in value.

In conclusion, the Court finds that the Plaintiff satisfied her burden of demonstrating that the Debtor (1) knowingly and fraudulently, (2) made a false oath in or in connection

15

with a case, (3) relating to material facts. The Debtor failed to disclose an asset and ascribed values to other assets that demonstrated a reckless disregard for the truth of his financial affairs. The Debtor's testimony as to his reasons for omitting the Rolex and undervaluing his bank account and classic car were not credible. The Debtor, an attorney, signed the verified declaration accompanying his Schedules of Assets under penalty of perjury, but the information on Schedule B was false and misleading.

## IV. CONCLUSION

In view of the foregoing the Court shall enter a judgment in favor of the Plaintiff and against the Defendant.

By the Court,

*Joan N. Feeney*

Joan N. Feeney
United States Bankruptcy Judge

Dated: February 14, 2011